Morris Hill representing, in the Butler case, Deputy District Attorney Burt, and Mr. Wood, who's seated at the table, is going to be representing Mr. Cervantes, who's also an appellant, and we would like to split the 15 minutes of our argument and reserve about five minutes to go about it, if that pleases you. The Butler case is a case in which I'm representing the individual Deputy District Attorney. The issues are whether deprivation of federal rights was properly alleged against Mr. Burt, and if so, did Mr. Burt, the prosecutor, show that he had immunity? The District Court denied summary judgment for Mr. Burt on three issues. Number one was whether Mr. Burt concealed the existence of a person who has been called Samaritan, a person who, by the way, Mr. Burt still doesn't even know who it is. But Samaritan is a person who turned up, according to the Attorney General, after the District Attorney's Office was accused in the case. After they took over the case, this person who's called Samaritan started making statements which implicated someone other than Mr. Butler as the shooter. The things that are important to remember on that is that that's an issue that could have been raised at a subsequent trial. In other words, this information came out after habeas was granted for the four of the plaintiffs who were petitioning for habeas, but before they went to retrial. So they could have litigated the issue of Samaritan if they thought it was important before they pleaded guilty to what they entered the plea for, which was essentially criminal responsibility for the shooting of Officer Hartless. And in that context, there was no necessity to prove that Mr. Butler was the shooter, only that those gentlemen were engaged in a criminal conspiracy which resulted foreseeably in the death of the late police officer. The reason that the District Court erred regarding Samaritan, the reason it's clearly subject to prosecutorial immunity, is because it really can only be analyzed in terms of a prosecutor's gravy duty to disclose exculpatory evidence. Obviously, if you've got somebody who says, I saw the shooting, these guys didn't do it, or this other guy did it that's unconnected with them, that's exculpatory towards the plaintiffs, in this case, as criminal defendants. And the police officer doesn't disclose exculpatory evidence or has no gravy duty. That's something that's defined in terms of how the judicial system addresses the receipt of evidence, and it's something that only a prosecutor has. That was emphasized in the Broome case recently in this circuit, and the Jean case, I think, from the Fourth Circuit also emphasized it even more compellingly. The next issue on which the District Court denied Samaritan judgment to Mr. Burt was the coercion of Mr. Palmer's testimony between the dates of June 19, 1991 and December 20, 1991. Those dates are significant because they are the dates between the time that Mr. Butler had a hung jury in the first trial and the time that the grand jury indicted the six plaintiffs in preparation for the second trial. And there is no allegation, there was no allegation, talking about this distinction between investigatory and prosecutorial function, there was no allegation that Mr. Burt told Mr. Palmer, the witness, to testify falsely. In fact, no allegation that Mr. Palmer testified falsely about anything to do with these plaintiffs, about their activities on the night of the shooting. There's no allegation that during, in the course of this six months, that Mr. Burt learned anything new, talking about investigative, just purely investigative. No allegation that he learned anything new that he didn't already know about the case, which we have here. Was Palmer's story the same in the first and the second trial? Essentially, yes. He elaborated. I think that the main differences was that in the second trial, he acknowledged that he owned the murder weapon. It was Mr. Palmer's gun that shot the officer. And in the first trial, I do not believe he acknowledged that. And there may have been a few other minor points, but the whole business of the conspiracy, the fact that these guys were out on the street that night and they were going to do a gang hit on this other gang that was in the neighborhood, those facts were developed by the police before Mr. Burt ever first became involved in the case. Now, which facts? The fact that he owned it or that he didn't own it? The fact that Mr. Palmer owned the gun is something that we only found out when Mr. Palmer admitted it. Admitted it when? You found it out? We found that out after the first trial. I understand that, but my question is more specific than that. When after the first trial? I do not have an exact... Before the second trial? It was before the second trial, certainly. In other words, during the investigation leading up to the second trial? Yes. Oh, so there was an investigation between the first and the second? Well, you call it an investigation. There was conferring with a witness who was going to testify at the second trial. And you learned things? We didn't learn who did what. But you learned factual information? Factual information related to the prosecution, sure. There's nothing that changed the relationships of the plaintiffs to what they were alleged to have done, because nobody really disputes what gun shot the officer. This is the gun that was found in this search of the backyard. The issue is who owns the gun. But it didn't change the fact of what Mr. Palmer said he did after the shooting, what direction he ran in, where he can be verified to have run in an opposite direction from where the gun was found. The gun was found nowhere near where Mr. Palmer is known to have gone. So the only thing that came to light that was of any significance was when Mr. Palmer did acknowledge that he owned the gun. And I can't tell you exactly when that acknowledgement came. But they had found the bullets on the street in the direction that Mr. Palmer had run in. Those were bullets that hit the gun. But, again, they're in the opposite direction from where the gun was found. So there isn't anything that changed. But you're just arguing that this additional information or this changed information, if that's the right way to say it, you're saying it's immaterial to the outcome of the second trial. Is that what you're saying? It was, because none of the individuals were charged at the second trial. The element of what they were charged with at the second trial didn't include that any one of them shot the officer. That was not an item that was to be proved. In fact, Mr. Palmer's opinion was that Mr. Butler did not shoot the officer. In Mr. Palmer's opinion, Mr. Standard shot the officer. But in the second trial, all they were showing is that there was a conspiracy to do an illegal act. And it resulted in somebody shooting him. We know it had to be one of these guys because the officer didn't kill himself. Let's assume for the moment that the information as to who owned the gun is material. I understand you're disputing that. Of course, it's my question. And let's assume further that there was improper conduct in the interviewing that led Mr. Palmer to say, you know what? I didn't tell you the truth in the first trial. I really owned it. Or he says, you know, I told you the truth in the first trial, but if you want me to say I owned it, I will. Is there absolute immunity for the interview that produces that second statement by Palmer? There's absolute immunity because it's interviewing a witness who's already testified once and is going to testify again. Everybody knows he's going to be a witness at this trial and we're preparing him to testify. But we have not brought any charges for the second trial yet. No, it's being presented to the grand jury. But we're preparing to present the case of the grand jury, which is clearly an immune function. Preparing a case to present to a grand jury. What if there had been no first trial and the second trial is the only trial. And this interview with Palmer took place then prior to all the things that took place in connection with the second trial. Would there be absolute immunity in your view? It would depend upon whether at that point there's probable cause to have anybody arrested. And in this case, we know the we know who the people are and we know what their involvements were. And we know that Mr. Palmer testified to their involvements at the first trial. So we're just we're developing the evidence that's already there. There's some refinements that came in, but it's not like we're solving the crime. So in your view, as soon as probable cause exists for an arrest, irrespective of whether the arrest has actually been performed, any interview by a prosecutor designed to elicit information is protected by absolute immunity. In the absence of something that takes it out of that, it's always dangerous to say it couldn't possibly be, you know, because maybe there is some fact situation that would twist it. But we haven't seen it in this case. But I just heard you say as soon as you have probable cause to arrest, as soon as we're that far along in the timeline, any interview conducted by a prosecutor designed to elicit information is protected by absolute immunity. I think that's what I heard you said. Well, all all interviews are going to be designed to elicit information. Correct. What do you call it? Preparing to testify. A prosecutor wants to know. No, no, no. But let's let me say the question. My question is timeline. And I understand the timeline under some arguments may not be absolutely dispositive. But I think you're telling me that the timeline is significantly important. I just want to make sure I understand the position. And that is we so long as you have probable cause to make an arrest, any interview conducted by a prosecutor after probable cause exists is protected by absolute immunity no matter what happens during an interview. That is to say, it's the warning of perjury, manufacturing of evidence. It doesn't matter. There's absolute immunity. The problem I have with your formulation is not the no matter what happens during the interview, but the purpose of the interview. You know, if we're interviewing, if we are interviewing somebody to find that that that there's probable cause, if there's probable cause being developed to arrest some new person, bring somebody new in, perhaps. But under ordinary circumstances where we already know who the cast of characters are and where we're meeting with a witness for purposes of learning what the witness is going to say and learning how to prepare our case and present it to the grand jury, then this is this is among the things that's covered. So in your in your view, it is relevant and important that there was already a trial and a jury as to these individuals. It is you already know who the cast of characters is. That's what I think. That's what you're telling me that this is part of the tapestry. I don't think it's I don't think that there hadn't been the first trial that we'd be talking about a remarkably different set of facts, though, because we're still talking about interviews that are in preparation to present. But what's happened in this case is you had a case that went to the went to the pedigree. You get a hung jury. And of course, in that situation, if you're going to reprosecute, the prosecutor kind of scratches his or her head and says, hmm, what went wrong? What can we fix? And sometimes what went wrong is something that we can fix without any difficulty. Sometimes it's hard. Sometimes you can do it without any improprieties at all. Sometimes I'm not saying necessarily that it happened here, although that's part of the sort of allegations from the other side. Oh, well, you know, we better fix this case up. Right. And you're saying that even though what you've got as a prosecutor is trying to fix up the case, because somehow it didn't go right the first time around, is nonetheless, you get some additional argument for it, for absolute immunity because the first prosecution went bad and you had a hung jury. Not necessarily. It was it's you've got to be a little more fact specific. I think you want to look at what is the prosecutor accused of having done in this in this interview? Is he accused of having planted an idea or planted facts or done something to to somehow create an element of the case that wasn't there before? In this case, in fact, we don't have any allegation that Mr. Palmer's testimony about the shooting and about the night of the shooting was false. So, yeah, I think you have a point that we can't just make a blanket rule that anything the prosecutor does between the first and second trial is automatically immune. And it has to be a little more focused than that. But it sounds like your argument may go back to the point that I asked you to assume away. But let's get a letter back. And you're saying. But the fact that he literally owns it or not, you're saying that's immaterial. Well, I'm filtering all this through the facts of this case. Sure. Sure. We could imagine hypotheticals. But certainly in this case where there's no allegation that something new was added by the prosecutor. Then all we have is witness preparation during this, during this. Well, something new was added, or at least we were changing the testimony. So we know we have a change in the testimony, a change in testimony. But, you know, as far as the as far as the basic crime is concerned, it's the same crime as it was before. But the change in the testimony may or may not make Palmer's overall testimony more believable. Well, if anything, it makes it less believable if he's the one who admits he owns the murder weapon. Right. Well, I don't know. I mean, the trial testimony is funny. Juries are funny. You say, well, you know, he admitted all these things that were against his interest. I guess I believe him instead of saying, you know, he says nothing is his fault. I don't believe a word he says. So, you know, how do I know? I mean, you couldn't have a workable rule that said that a prosecutor loses immunity just because he learns of something, some factoid new that he didn't know before. And he learns it in the process of preparing a witness to testify to the grand jury, because that's going to happen in every case. And if you say that because the prosecutor may have learned something in preparing a witness they didn't know before, then. But the question is, when is he preparing the witness? We know. I guess I guess you've assumed the answer by saying preparing a witness. What I'm talking about is in conducting an interview with somebody who's going to testify. Is that preparing a witness or is that investigating? If you already have if you already have probable cause established and you're not changing your theory of probable cause, who done it? If you're if your theory is not changing and your basic facts are not changing, then you're preparing a witness. You're looking at whatever happens after that, whatever encouragement you might give the witness, whatever seeds you might plant in the witness's mind. That doesn't matter because probable cause is going to stay as a general proposition. Yes. If you've got if you've got you've got to draw the line somewhere. And that seems to be where the Supreme Court has drawn it. When you're focused on preparing a case to present a prosecution to present and you're not in the who done it stage where you're trying to figure out who did the who did the crime. If you already established who you're going to prosecute and why you're going to prosecute them, then when you're meeting with a witness, you're you're developing those facts. Even if you even if you ask the witness to commit perjury. Well, those are the facts in Imbler, I believe. There's a footnote 34 or something like that in Imbler where that's essentially what the prosecutor was accused of encouraging the witness to commit perjury. You don't have a lot of difference. I might just say for the historical record, I've known Pacman for 62 years. Did that help me or hurt me? He's a sweet guy. Military training program together. I think he's one time he was mayor of Culver City. Maybe he should have run in Santa Monica. Well, in any event, though, in answer to Judge Fletcher's question, unless you're going to allege something that puts the case back in the who done it stage. I'm not saying a case couldn't go back into the who done it stage. But of course, any prosecution is a lot more than who done it, it's why done it. Because unless you have a good why done it, you don't get a conviction. But they had who done it and they had why done it. That's why in support of our motion. But this all goes to materiality. That's why I put in the police reports that show that within hours after this officer was shot, they already had the basic framework of the case worked out. And it never changed. Somebody all of a sudden finds the gun under the lemon tree. They look before and then all of a sudden it shows up. Well, we got we either believe that the we either believe that Mr. Godin planted the gun under the lemon tree the night of the shooting or he planted it the next morning or gave it to his brother to plant the next morning. Either way, Mr. Godin planted the gun. So that that to me never. That's like a. So what argument? We know that Mr. Godin had the gun. We don't pretend Mr. Godin was the shooter. And we know the gun ended up in the back yard because that's where it was found. These are all these are all great things to raise at a criminal trial, which is where, by the way, they were raised. And he didn't do it good because he's not convicted anyway. You know, all this all this gun plant stuff was beaten to death at the second criminal trial. So, Mr. Wood, I think we'd like to present something for Mr. Cervantes. May I please the court. My name is John Wood. I represent Edward Cervantes, who was an investigator in the district attorney's office. The undisputed back before the court. All of that functioned as an investigator in the office that he worked under the direction of the district attorney staff. Actually, with the case was related to the prosecution of the case. There were no affidavits submitted by the other side challenging any of those facts. With respect to the essentially three issues of respect to Mr. Cervantes, one is the so-called comparison issue. There is similar to what Mr. Morris stated. In Mr. Cervantes case, he's not a situation. He's not a prosecutor. He's an investigator. And it's very clear that as an investigator in an office, there is no duty on him at any time. Whatever phase, whatever he's doing, whether it's prosecutorial, if you label it that, or purely investigative, if you label it that. To turn over or disclose anything to anyone other than in this case would have been Mr. Burke, the district attorney. And I believe the Brum case makes that clear. The trial court in this case we submit committed error in saying in the ruling that there was a triumphal issue of fact as to whether Mr. Cervantes suppressed information concerning Samaritan. It's our position that the court was in error because there was simply no duty. Since there's no duty, it's impossible to be held accountable or liable for suppressing something that in the first instance you don't have a duty to disclose. Aside from that, I take the bill of suspenders approach to this, Mr. Cervantes would also be entitled to immunity because the issue of disclosure of exculpatory information is an issue which the courts have clearly addressed. And Mr. Cervantes would be entitled to immunity for that. Moreover, the complaint in this case does not allege that Mr. Cervantes took the statement from the so-called Samaritan. And the complaint does not allege that Mr. Cervantes suppressed that statement. It's just a general allegation in the complaint that he suppressed evidence. But with respect to Samaritan, the complaint is carved out, I believe it's in paragraphs 35, 36, and 37, the Samaritan allegations. And those allegations specifically point out and allege that it is the district attorney that suppressed the information, not Mr. Cervantes. So under this situation, it's Mr. Cervantes' position that the district court was in error as to the Samaritan issue. As to the other issue that Mr. Morris addressed a moment ago dealing with the period of time after the first trial and before the second trial, it's our position that the matter of law and unity would attach in all cases like this. If it were not to attach in this situation, in every single case, a court after the fact would have to go through some sort of hair-splitting analysis to determine what actions may relate to, for example, the first case and what may relate to the second case or the grand jury matter related to the second case. And I submit that's a task that's impossible to undertake. Moreover, think of the situation of a prosecutor following a mistrial of a case. The case is still pending. The case against Mr. Butler was still on file in the court. It was simply a mistrial was declared. A prosecutor in this case has to sit down with somebody that I think everybody will agree is a chief witness and talk to that chief witness about the mistrial. Imagine the confusion and the problems that would evolve if that prosecutor someday could be held liable for what evolved from that conversation. Whatever label you were to put on it, whether the prosecutor gained new information, presumably would be the case in most instances. But does your argument go so far as to say that whenever there's been a mistrial and then a retrial of the same defendant or defendants, there can be no investigation that's protected only by qualified immunity? It's my position that any, under those circumstances, absolute immunity would attach. Under any circumstances. There is no such thing as investigation in between those two trials. Yes. Oh, hello. What if all of a sudden the prosecutor says, you know, the reason we lost this is we just didn't have enough evidence. Would you guys go out and find some more testifying witnesses? And the investigator goes out and finds three more testifying witnesses that they didn't know existed before. They suspected they might. That's not investigation. Well, you can label it investigation. But I think it falls, perhaps it was an argument I heard earlier, it falls in the category that's an investigation that's intimately related to the prosecution of the case. That's making the exception to swallow up the rule, for gosh sake, that argument and the argument that was before. That anything is presenting the case. I mean, it defies logic that once there's a trial and a retrial that there can't be further investigation. Indeed, during a trial itself, there very often is investigation. So, you know, I speak for myself. That's a preposterous position to take. I think it becomes less preposterous if one keeps in mind that at some point before the first case was filed, there came a point when there was a probable cause determination. And presumably there was a probable cause determination throughout the case. So, you're dealing with a situation where probable cause exists and you have a prosecutor conducting a subsequent investigation. Given that fact, this is not a pre-probable cause investigation. Well, you're skilled people in prosecution. You must know that in prosecutions there, and even when indictments are found, as I suggested, even during a trial itself, investigations are very often ongoing during the very case which is being heard because witnesses come forward and the defense attorney or the prosecutor has new information that he has to have ascertained or verified. So that investigations are never at an end. And to say that just because one trial has concluded in a mistrial and they're going into a second, you know, that's a pretty weak argument. And to say that at that point everything is related to presenting the case is, as I mentioned, swallowing up the rule with the exception. Well, perhaps I can narrow it down. Why don't you do that? In this case. Narrow it down to the facts of this case. In this case, the alleged wrong occurred in a conversation with a key star, one of the star witnesses in the case who had already testified. Well, they weren't going out, sifting around for new witnesses, new evidence. They were dealing with a witness who had testified at length and had been cross-examined for days in the first case. So what did they have to butter him up with favors and so forth? They knew his story. They had it in testimony. It's very suspicious that they have to keep him so warm and happy if they're not getting any new information from the man. Well, keep in mind, these are the allegations in the, I believe the court is referring to warm and happy, the allegations in the complaint. Yeah. But still, under these circumstances, I would submit that in most instances, a prosecutor in a murder case, especially involving a police officer and one that was as well-publicized and important as this one, would certainly want to go talk to perhaps a number of the witnesses who testified in the first case to shore things up, to get ready for the next trial. And I submit that's the situation we're in here. Does that rule out talking to witnesses in order to get new information? No, not at all. Not at all. Well, if you're doing that, aren't you investigating? Well, you put that label on it, but I think it's investigation that's associated with the trial process and the preparation. There you go, swallowing up the rule with the exception again. Well, I submit that a prosecutor is immune for, I think everybody will agree, withholding exculpatory evidence, refusing to turn something over. Well, that's one way, if you will, of skewing or twisting the evidence that comes in at trial. And sitting a witness down and saying you should lie and tell this story is certainly not different than that, in effect, because you're asking to skew the testimony or the evidence the jury will hear. So if they're absolutely immune in one instance, they should be immune in the other as well. The prosecutor is going to be in a real dilemma if... You know, the prosecutor is not in a real dilemma. The prosecutor knows exactly what his job is. You're not talking about a prosecutor in a dilemma. You're talking about protecting a prosecutor from consequences of his wrongdoing. Every prosecutor knows what he or she is supposed to do. There is no dilemma. That I would concur with. But nevertheless, the immunity is there for the reasons that have been well articulated. And the immunity would be threatened. And the reasons underlying the immunity would be threatened if a prosecutor could be dragged into court based on allegations of what was said or allegedly not said in a conversation with a star witness in a criminal prosecution after the case was over. This could happen in any case. Suppose there's an indictment found that it's ready to go to trial and the prosecutor goes out of his office and goes and interviews a witness that the investigating staff has not interviewed yet. Is that investigative? A brand new witness? Yes, yes. That came to his attention through his office. And he goes out and says, look, this is an important case. I'm going to interview this guy myself. I would think that the first question is a probable cause. There were probable causes. The guy's been indicted. We're ready to go to trial next week. Then, yes, that's perfectly fine. I would expect the prosecutor to do that. Is that investigative or is that preparing a case? Well, again, that would perhaps have an investigative label. But it would be so intimately associated with the prosecution of the case that the prosecutor should have immunity. Even though it's a new witness that came to the prosecutor's attention. Never interviewed. He doesn't have a witness statement. No workup by the detectives in the file. And the prosecutor says, I'm going to interview this guy myself. I was a prosecutor once. And I must have crossed that bridge at one point or another. And I would expect a prosecutor to pick up the phone or get in his car or her car and drive out if need be. I mean, ideally, you might have somebody else do it for a variety of other reasons, for trial purposes. But the prosecutor wanted to do it himself. Sure. That would be investigative, wouldn't it? It would under the hypothetical. All right. What's the difference between that? If you're a prosecutor and you have a witness, you have a statement from a witness who you're going to use in this forthcoming trial. And you don't like the statement. So you go out to see the witness and say, look, I want more information than your statement previously revealed. Tell me other aspects of the case that the prior investigator did not write up in the statement. Is that prosecutor investigating the case at that point? Again, I think you put the same label on it. To the extent he's getting new information, I think you could fairly call it that. But again, I think Buckley and Embler point out that the prosecutor has to do some things to prepare for the prosecution of a case. And I submit under those circumstances, that's who would fall under the immunity. If it were not to fall under the immunity, for whatever reason it weren't, you would have a prosecutor tied to his chair in his office or her chair before a case went to trial. Well, maybe if he wants absolute immunity, that's what he's got to do. Under that analysis. But if he's willing to take his chances with qualified immunity, which provides a fair amount of protection, he's not tied to his chair at all. The trouble with qualified immunity. I mean, a prosecutor before any institution, any, let's take not this case, but any case. Okay. There's been no information filed, nothing. You're saying that a prosecutor would be tied to his chair. He would never conduct any investigation. But that's not true. Prosecutors do conduct investigations prior to probable cause and so on. I mean, they may not do it all the time, but they do it. Sure. So they're not tied to their chair. Well, because it's hypothetical. The prosecutor goes out, talks to a witness. The witness or somebody accuses the prosecutor of soliciting perjury. They're right here in this courtroom going through an analysis. Well, there's a factual issue about whether he or she violated clearly established constitutional principles. And then there's a trial. And you essentially defeat. And the prosecutor's not in a position to impeach the witness through the prosecutor's statements. I'm sorry? I thought that was a very clear question. Sorry, I didn't hear the first part, Your Honor. No, if the prosecutor is out there and he has a conversation with a witness, all right, and the witness then takes the stand and testifies contrary to what the prosecutor thought he said, then the prosecutor's really not much of a position to impeach that witness. No, that was sort of remarked a moment ago. There are other problems with speaking with witnesses. You might get yourself in the bind of having to testify to impeach that very witness. So there are problems inherent in talking to witnesses, sure. But should immunity attach to that type of activity? Most probably it doesn't exist, yes. Otherwise, you literally are going to have a prosecutor who would change his or her desk. Well, it's so clear from this record that in between the two trials that there was no investigation going on. They were just keeping everyone happy and a smile on everyone's face. No, it's not that clear, is it? No, I think that would not be a contention in this case. But the allegations in the case are such that they fall within the immunity because the nature of the, if you will, investigative activities fall within the immunity. The prosecutor has to prepare his or her case. And that involves talking. I mean, you have to talk to witnesses. And if they're not immune for talking to witnesses, absolutely immune. Well, doesn't that depend upon what they're talking to the witness about? You're talking to the witness about getting ready for trial prep, getting ready for what we're going to accentuate and what we're going to downplay and so forth. Or you're talking to the witness about what else could we come up with here that could strengthen the case, a new factual scenario or a new spin on the facts. Isn't that investigative? Again, to a certain degree, yes. But if it's done after you have probable cause and as part of the prosecution, the immunity should apply. Well, there you go swallowing up the rule again. Well, I don't think the rule falls away because if you don't have, you get to some point before the jury is entangled when I think everybody agrees prosecution immunity attaches. And there's no bright line to it. It's fuzzy at best. Well, if it's fuzzy, shouldn't a jury determine it? Well, if it's a fuzzy line, whether there was preparing the case for trial or investigating it, if it's a fuzzy line, then it's a jury question, isn't it? Well, interestingly enough, I think that gets back to the reason for the immunity in the first instance, and that's so prosecutors don't have to show up in courthouses based on accusations made by people who are prosecutors and otherwise may be involved in cases, you know, witnesses to prosecutors as well. Yeah, but the facts have to be, there has to be, the historic facts have to not be in dispute in order for immunity to be granted. Yeah, at this stage, yeah. One last point. The state causes of action, the one thing that is clear in this case is the breadth of state law in the country of California is greater than the federal law, and that includes the investigative process, and I would submit that the trial court error did not sustain summary judgment of those causes. Thank you. All right. The presentation that was just made essentially was whatever a prosecutor does or whatever his investigator does, no matter how outrageous or at what time, is absolutely immune because we don't want them to be sued. Counsel did not address to you what I consider one of the important parts of the case. We alleged, by the way, contrary to the representations, we alleged specifically in the complaint that Mr. Burt, early in the proceeding and before the indictment came down from the grand jury on the six defendants who were in the second trial, we specifically alleged that he and Cervantes fabricated evidence, suborned perjury from the witness Palmer, and radically retooled his testimony in that regard. And you're referring to the period between the two trials? I am. Yes, sir. And his testimony was radically different. Their theory of prosecution was radically different, and the interviews that took place in that interim were to explore an entirely new set of facts, or in this case we allege a new perjury, in order to put together this case. It was investigative in nature. This is a procedural point. This is coming up to us not on a 12B6, but on a summary judgment. I think we've got a little bit of confusion in the language in some of the case law, perhaps even in the district court. I don't think it's enough for you merely to allege. I think you've got to do the ordinary standards of proof at summary judgment. We take whatever facts you put in evidence, and we construe them in your favor. But we don't, there's not enough merely to look at your allegations. Do you agree with that? Actually, yes and no. I believe that if a summary judgment motion is properly made, that it may be heard. In this case, all they did was to say, we're immune, and they submitted these little five-sentence declarations that basically said, I'm an investigator. I just did what Mr. Burt said. I was always acting as an investigator, only for Mr. Burt. I'll ask a different question. I think you're going to agree with me, and that is to say, the ordinary rules as to what must be put forward, either in moving for or opposing summary judgment, are not changed because we're addressing qualified immunity. Is that right? Qualified immunity, no. Or, I'm sorry, judicial immunity. Judge Fletcher, I looked at all of the cases, and frankly, I recognize the nature of this is the cases are going all over the place. There's a significant number of cases in which, even though it's technically denominated summary judgment, the court says we're going to treat it in effect as a 12B6 motion and take the allegations as they are alleged as true. And that's what the district court actually did in this case. I know that. That's why I'm asking this question. See, we had submitted substantial amounts of sworn testimony. We asked the court to take judicial notice of Judge Kennedy's findings. Judge Kennedy was the Superior Court judge who held a habeas hearing that went some three months in length, had 52 witnesses, 300 exhibits, and who made specific and explicit findings. The fact that Mr. Burt was involved in committing perjury during that hearing, suborning perjury from the witness, in hiding and secreting critical evidence. And we had that as well as the Court of Appeals decision. And we asked the court to take some judicial notice of it as part of our contrary showing. And they objected. And I think, just honestly, to finesse the issue of do I take judicial notice or not, the judge said in her ruling, I'm simply going to treat the case from the complaint as though these are well-pled allegations and see if immunity applies. And now, Judge Fletcher, technically, as a matter of course, since it was denominated summary judgment, was that appropriate? Probably not. On the other hand, their showing as to why they should be granted immunity was de minimis and pro forma only and conclusory in the extreme. They submitted, I think, a five-line affidavit for Cervantes and a six-line affidavit for Burt. So I think that although the court's procedural question, I think, is right on point, and technically, I think, if they denominated a summary judgment motion and come forward with sufficient evidence to call forth a response on the immunity issue, then we would have been put to provide a factual response, which we did, but the court didn't want to take judicial notice and so simply, in essence, converted it to a 12B6 motion. Let me, if I could, go to this. They even claim that the following conduct is immune, that in pursuance to and as a reward for agreeing to commit perjury, the district attorney's office, specifically investigator Cervantes, and we allege in the complaint with the knowledge and connivance of Burt, provided women or provided a place for their witness, Palmer, to meet with and have sexual intercourse with women on at least ten times with Tracy Palmer. She was his wife, but the district attorney's office didn't want to be confined by Victorian morality. They also permitted the admission to and gave a secret place to and moved into a bathroom so they could have sexual relations while Mr. Cervantes stood guard, a girlfriend, Kathy Hill. And their mistake was they didn't realize they not only had to keep Mr. Palmer happy, but Mrs. Palmer happy. Yes, Your Honor. Yes, Your Honor. Okay, we got that part. Now, with all due respect, there's a point that I need to make because I'm asking the court to make clear one thing in its opinion. And that is something that it's averted to in the Milstein case and also in Buckley v. Fitzsimmons because there's always this talk about probable cause, probable cause, and in effect, the other side is asking you to say probable cause is the bright line test. Once probable cause arises, absent special circumstances, everything a prosecutor does is prosecutorial or in the nature of advocacy or preparation as opposed to investigative. Footnote five of Buckley v. Fitzsimmons says it's actually the other way. It says very rarely before probable cause arises will anything the prosecutor does be considered to be anything other than investigative. But of course, things that the prosecutor does after probable cause can be investigative as well. So there's no, in other words, they sort of flip the bright line test because it's not a bright line test. But before probable cause, before, and by the way, I suggest that's a judicial determination of some sort or an act. Either an arrest, a finding at a preliminary hearing, or an indictment as opposed to some amorphous determination and some prosecutor saying, oh, I have probable cause. But something that focuses on the judicial process. If we agree it's the function of what the prosecutor or the investigator is doing as to whether or not it's preparing for trial and going to bat or investigating. And that could even, in my view, be even during the trial you could be investigating a case. But let me ask you this. Just because the prosecutor or his investigator is furnishing sexual favors to a witness at any stage doesn't mean that it's investigative. I mean, prosecutors do a lot to keep the witnesses happy so that they'll, and I'm not saying so they'll suborn themselves, but keep them in line so that they are available. And defense attorneys do too. I'm not saying anyone should go to any particular extremes. But I'm saying there are extremes and mainly, and because those extremes are exercised, it doesn't necessarily mean that it's a failure to presenting the case for trial. I understand what you're saying, Judge Cahn, but let me suggest this. First of all, we say in this case the sex which was provided, regardless of whether it was a quid pro quo for the pretrial agreement to commit perjury. Okay, yeah. If you could prove that, that would be investigative. Secondly, I'd like to suggest this. That the fabrication of evidence by way of perjury, and I wouldn't just say fabrication of evidence, but fabrication of evidence by way of perjury which is supported by bribery. In other words, the payment of an illicit quid pro quo from the prosecutor to the witness cannot be ever anything but actionable, civilly actionable misconduct. I'm making that a narrow category. In other words, I'm saying that no prosecutor, for example, if the prosecutor says to a witness, you say this, we know it's false, and I will give you $1,000 for saying it. Embler is to the contrary, sir. And we didn't make the law, it was given to us. That a prosecutor who tells a witness, look, you go in there, I'm prepping you for trial, the facts as you related to us are ABC, you testify to XYZ, and you testify to that, and then we'll nolly-cross the indictment that we've got against you. And that's subject to absolute immunity. Maybe I misinterpreted Embler, but I thought what Embler said, and the law is clear, the actual knowing presentation of perjury in a judicial proceeding is immune. That's absolutely immune. What Milstein tells us, what Buckley versus Fitzgerald tells us, is that the subordination or fabrication of evidence, certainly at an early point in the proceeding, but I would submit even at a later point in the proceeding, if there is also, in addition not only to the subordination of perjury, but something that is conceitedly an illicit, an illegal quid pro quo. Well, it's illegal to tell a witness to suborn themselves, and the prosecutor could be indicted for perjury. Yet the person who suffers that wrong has no, your client would have no 1983 case. Judge Cowen, you're absolutely right. The reason why I'm proposing this, fabrication plus bribery is never immune, is because of the policy reason essentially underlying prosecutorial immunity, which has been adverted to here, which is this. There are some cases, the two cases that you have before you today, in which we've had the luxury of extensive evidentiary hearings, are not these cases, but there are some cases in which the miasma of time and the anger of a criminal defendant will cause litigation, vexatious litigation, to occur. So as I think it was Justice Hand said in Gregoire versus Biddle, the policy is that we deliberately deny relief to the wronged few, so that the many prosecutors will not constantly live under terrible fear. And so we have these cases that say, I choke when I read these things. Can I bring you back to this case?  I'm interested in your argument that as to the testimony of Palmer between the first and the second, that there were material changes, the theory of the case changed, and we're not just talking about one itty-bitty thing like, for example, did he or did he not own the gun. Can you elaborate on the changes in the testimony that, in your view, and on the evidence that you presented, the changes in the testimony and the relevance to the second prosecution? Absolutely. Specifically, we presented the findings of fact of Judge Kennedy, and he noted that between the first and the second trial, there was a radical change, not only in the testimony, but in the factual underpinning. Can you briefly outline what those changes in testimony were and the change in theory? Specifically, there was a change in which no longer did Palmer and the other witnesses focus on saying Mr. Butler shot the gun, but that all six defendants were involved in scouting out a rival group's house for the possible purposes of killing someone. And that, therefore, because they engaged in that, they were, therefore, engaged in conduct which was inherently dangerous, and which, if anybody got killed by anybody, including even a bystander or a rival gang member, then that was, in effect, felony murder. So he added meetings that he hadn't testified about. There's no Palmer. Palmer testified about meetings that he hadn't testified in the first trial. There's motivations for this activity to occur. Persons whom he had not mentioned in the first trial, and I will put it here in the second trial. And the whole focus of the testimony changed, so much so that Judge Kennedy noted in his findings of fact that whenever Palmer was confronted with one of the changes and the contradictions between his first trial testimony and his current trial testimony, he said, well, I was just saying in the first trial what Sir Bobby told me to say. Now I'm telling you the truth. This is really what happened. And so, in other words, we had Palmer on the road saying, well, when I testified in the first trial, I was just saying what they told me to say. But now, at the second trial, I'm really telling you the truth. You can trust me. Now, I said it wasn't my gun before. It was my gun. My gun was the murder weapon. Trust me. I'm a government witness. There's one final point. I know you've sat here all day long. No, you still got some time. I just wanted to get you back on what for me was going to be a more interesting question. And maybe something that I need to make sure that I absolutely focus on. What we say is that they, and there's no contrary evidence in a la summary judgment that they submitted as a matter of the record before the district court. But we alleged in the complaint and submitted substantial evidence in support of our allegation that after the first Butler trial ended in a mistrial and six jurors said he didn't shoot the gun. He was not the person who shot this officer. The prosecution then said, oh, we're going to change the theory of the case. We opened the investigation. We interviewed witnesses, went back to Palmer with the new theory. And it is during this time that we have the 75 trips that Palmer makes from the jail to the district attorney's office. Not always for affidavit because the record shows us that Mr. Burt on at least half of his 75 trips for what was euphemistically called stress relief actually talked to Mr. Palmer. But for the other half, Palmer would just say, I want to come. I need a break from the tedium of the jail. They would go and pick him up and bring him into the DA's office. If a woman or a girlfriend was there, they would turn their backs. He would have sexual relations. Of course, when he was in the jail, the DA's office worked out a special deal. He could call into the secretary at the DA's office and she would place a call for him anywhere he wanted. $5,690 of taxpayer money was expended for Mr. Palmer. And we say, I think this is in the record, but I just don't know the answer to this. Were there any such favors or if so, how many such favors extended before the first trial? Before the first trial, there's no evidence in the record that there was sexual favors. And the issue about the phone calls only, as I recall from the record, is after the first trial. Judge Kennedy addressed this as well. He said, look, they presented something to the jury that he was just doing it out of decency. But the fact of the matter is that there was a secret deal that was concealed from this jury, not only concerning the sex, the phone calls, but also concerning the DA ultimately going in and getting the guy cut loose after the conviction on a 25-year sentence. But, he said, one can only imagine what secret, undisclosed deals they had for the testimony in the first trial. But we don't have the evidence, so it would not be proper for me to say. What I am saying, though, is that with respect to these improper, unauthorized, illegal benefits, that those are not investigative. They may be administrative, but they are beyond the scope of any immunity, even qualified immunity. They are absolutely illegal, and they should not be accorded any special protection. For the people to stand up here and say, look, we say not only can we pre-indictment suborn perjury because we're preparing for something, but in order to have our witness say something in a happy way, to be relieved of his stress, we can give him assignations and secret sexual thrists. Well, it's a matter of degree, though. The government, as well as defense attorneys, do favors for witnesses to keep them happy and in line. So, I mean, what happened here was this was the ultimate, they took it to the ultimate degree. You still have to prove that, and it may be some proof that it was happening, that they were investigating the case in order to keep him from, or to make him amenable to their new story or theory, as you have set forth. But in and of itself, the fact that they were affording him sex does not mean that they were investigating the case. It may be proof that would help you prove that, but it's not the end of the story. Because then you could say, well, they've got a witness that's cooperating and they're getting special food, they get the telephone. It doesn't mean that they're investigating it, they're just keeping the guy warm. It's true. We allege, though, we allege, and I think it is a fair inference that a jury would be permitted to draw and should be permitted to draw at a trial evidence of an illegal agreement that was in the investigative stage in 1991 between June and December. And if they're making an agreement to a quid pro quo for testimony, that's certainly a jury could draw an inference that that's not preparing the case for trial. That's investigative because they're working up the facts of the case. Yes. And ultimately, Judge Keefe wrote, as to this issue, there is a question of fact. It cannot be resolved on summary judgment or on a motion to dismiss, and the case must proceed. My only and final submission is simply this, that pimping and pandering cannot fall under the rubric of prosecutorial immunity. And for I agree that it has to be associated with some prior investigative or other misconduct, but it shows the really the reductio ad absurdum of the argument that's made in this case where, you know, they would say, well, if the prosecutor kills a witness and then frames somebody, that's part of the preparation of the case because we were going to prosecute the wrong guy. You can't do this. Are you satisfied for us to adjudicate this matter on the record before us or as it has come to us on the record for us, or vis-à-vis the discussion you had with Judge Fletcher concerning the question as to whether or not this was inappropriately or appropriately converted to a rule of summary judgment when it was a 12B6? May I submit an additional three-page pleading to the Court just setting forth the procedural background and the other cases that have treated this motion in such a way? Well, I think we know the law. We know the question to do is, are you satisfied for us to adjudicate it on the record before us? I'll ask your adversary the same question. Or do you want to remand for the purpose of, if we see it that way, that this should be a true summary judgment application with both parties having the opportunity to submit any evidence concerning their factual positions? In the absence of a specific factual submission by the other side, which I believe that they didn't do? Well, you said they did submit something, and anything that you submit that there's a 12B6, the Court's got to convert it to, or can't consider what's submitted. Well, if the Court, I believe that the Court clearly had the power to consider and take judicial notice of Judge Kennedy's factual findings as the referee and the Court of Appeals' decision. Under Rule 201 of the Federal Rules of Evidence, those were judicially noticeable. They were decisions of a lower court, and they were findings of fact of Judge Kennedy. But that's not what the Court based its ruling on. It didn't. It declined to rule one way or the other on whether it would take that judicial notice. But you asked me if I'm satisfied on the record. If this Court can take judicial notice of the factual materials that we submitted, I have no question that we survive any motion they bring. If, however, the Court feels that the trial court's deferral or decision not to rule on the judicial notice issue precludes this Court from considering the factual materials that we submitted, the transcripts, the findings, and the Court of Appeals' opinion, then I would ask the Court to remand it so that we may properly make another submission and request for the trial court to take judicial notice of various things, as well as the transcripts which we submitted, which really she didn't consider. In other words, the judge, in looking at this, although she sort of uses the language of summary judgment, the tribal issues of fact, she really says in the first paragraph, it's proper for me just to consider the allegations of the complaint. And she cites some cases. A lot of courts have treated these absolute immunity issues, whether they're technically denominated summary judgment or technically denominated 12b-6, they really treat them as 12b-6. Or 12b-6 with a supplement, even though you're absolutely right, Judge Talen, if there's a supplement, it should be converted to a summary judgment. But that's just the way they do it. I don't understand half the cases myself. I don't either, so that's worse. But I understand that letting this guy do this in the DA's office to have him lie in court is something that even simple-minded little me sees can't be justified, can't be immunized, and is way beyond the pale and beyond the policy considerations designed to protect prosecutors who are legitimately there doing their job and sometimes making an error in judgment. This goes far beyond that. Thank you. Let's have some quick rebuttal. The problem I have now is, this goes back to what Judge Fletcher tried to get into a little earlier. What is the proof that is required to overcome a summary judgment motion where the defendant comes in and says, look, the police developed a probable cause in this case before I ever got involved in the case. I took over the case after the theory was already developed. I heard Mr. Iredale's argument. If I were to write the summary judgment motion today, I would have no more specific facts to put in it as far as Mr. Burt denying that he did something specific than I did back when I wrote it then. He said the prosecution no longer said at the second trial that Butler shot the gun. No, that never happened. We still think that Mr. Butler shot the officer. It's just that in the second trial, these guys were prosecuted for conspiracy. The theory that Mr. Butler shot the officer has never changed. Palmer never did say at the first or second trial that Mr. Butler shot the officer. Palmer thinks Standard did it, so his testimony never changed. Mr. Iredale talked about all these new meetings. I don't know of one new meeting. I was looking at my client while we were hearing this, you know. Where is there any new meeting that came out at the second trial that Mr. Palmer didn't testify to first? New persons that were involved. That never happened. His testimony about all the essential facts of the case were the same. But if Mr. Iredale says otherwise, then why don't we have any evidence? Do we have in the record in front of us the transcripts of the two trials so that we ourselves may compare them? You have some of that, I believe. Our objection was specifically to Judge Kennedy's conclusions, which they wanted to have judicially noticed. And we made our objection to that. And that was already discussed. But there are some transcripts. I don't know if they're enough for your purposes. We have the transcripts. If anybody wants them, just let us know and we'll be happy to submit them. Fortunately, I'm not a trial judge. If it's not in the record now, it's not going to be in the record in front of me later. I'm suggesting to you I put as much of the record as I thought was pertinent to the issues here. But I don't know how to address when I hear people say there was all this new testimony about new meetings of these new people. I don't know what to say about that because I don't know where that comes from. And I'm intimately involved with this case. I can't imagine where that came from except out of thin air. At trial, it was not adjudicated whether the court should take judicial notice of these public records. Judge Keefe didn't say, didn't she sort of... Didn't rule one way or the other. She said that the, you know, I'm going to look at this as a 12B6 motion because this is an immunity case. And, you know, there's... Well, no, the question is this. The judge did not rule as to whether or not it was proper or improper to take judicial notice of these findings for Kelly and so forth. She did not sustain our objection. She didn't rule. She didn't sustain it. She didn't overrule it. Do you have any objection for us to rule on that? On whether it should be... Yes. Because it's before us. The record is before us. She didn't rule, so we don't have a benefit of her ruling on that. But why can't we, on appeal, determine that she should have ruled and rule in her place? It's a question of law. It's not even a question of fact. I hardly think you can avoid it, actually. You know, ruling on that, because that's pretty basic to what we're arguing about here. And if we rule on that, there'd be no reason, if we were inclined to, to remand this for further proceedings as to the summary judgment application that your friend across the aisle was in some way suggesting. Well, to the... You know, obviously, we want to get the thing over with. And to the extent that we just go back and start the whole process over again, it becomes very burdensome. But there's no objection to us ruling on appeal that it was or was not proper to take judicial notice of this. And if we rule that it was not, we can't consider it. And if we rule it was, we could consider it. That would be within... That would be one of your... Prerogatives. Yes. I think so. The Judge Kennedy's findings supposedly found all these undisclosed... Well, what Judge Kennedy found, his number one finding, was an undisclosed plea sentence agreement. I don't recall anything in Judge Kennedy about these guys didn't commit the crime, these guys are innocent, Darren Palmer testified falsely. I don't recall any of that as far as the facts of the crime. They're talking about this sex stuff. Well, one of you asked the question, did any of the sex allegedly take place before the first trial? I'll go a step further. None of the sex allegedly took place before the second trial. We're talking about sexual allegations of things that supposedly happened in 1994. Darren Palmer testified at the second trial in 1993. So we're talking about sex that, if it happened, happened after Darren Palmer testified the second time around. And if they wanted to get into that, if they wanted to make an issue of whether that was something that undermined his testimony, they had the opportunity to have a third trial, which they avoided by pleading guilty. So the sex stuff, if it happened, all of the information we have points to it happening after Palmer's testimony in the second trial. That's not saying it was right if it happened. I'm not here to defend sex in the DA's office. But there's no specific allegation of any of the sex happening on a date before he testified in the second trial. I thought Judge Kennedy found that there was sex between the two trials. Well, the trial is still going on. We're talking – After the mistrial and before the – Judge Kennedy's – I'm specifically talking about – the trial ended in 1994. Which trial? The second trial. Well, I'm talking about the mistrial. The mistrial ended in between the mistrial and the beginning of the second trial, of course. Mistrial in mid-1991. Okay. Second trial begins in 1993. Darren Palmer testifies in 1993 for some weeks. Trial rolls over in 1994. Sex allegedly happens in 1994. I can't say that none of the sex didn't allegedly happen while the trial was still going on. But Darren's Palmer testimony came early in the trial. I got the impression that happened after the mistrial. I don't think you'll find anything specific on that point. In fact, it's been devilishly difficult. You know, since we don't really believe that all this – this brothel atmosphere of the DA's office really took place. But clearly there was a lack of supervision of Darren Palmer at one point. That much is clear, whether it was anybody intending to let that happen. Certainly today it wouldn't happen because we've had a folding cell. But we're not interested in policing the DA's office. But let me answer. You don't disagree with the proposition that merely because probable cause has been found, or even an indictment has been founded, that an investigation cannot continue? Investigation should continue. Even I would go further than that and say – Okay. No, I just want you to – you know, those features. Just tell me. So the fact that there's probable cause, or even an indictment, or even a trial ongoing, is not – it is not theoretically impossible to still have an ongoing investigation. Even after conviction. Correct. Because if somebody raises a legitimate issue that this person didn't do when he was convicted of doing something – You and I are on the same wavelength. Then the question, of course, for us is whether or not any of the activity that occurred was investigative. You claim it was only – Investigative, not directly related to the prosecution. To the prosecution. And I understand your point about you can't have an exception that swallows up the whole room. And that's why I think it's useful to think of it in terms of the who done it, and as Judge Fletcher said, the why done it phase of it. If you're out to create the theory of the case and who did it, then that's something that I think we all agree that there's no absolute immunity for that. But if we are investigating during trial, of course. That's why DAs have investigators. Otherwise, they wouldn't need investigators. And they all have them. To ferret out new facts. Find new witnesses, find new facts. And how about to find new causes of action with the same witnesses? Would that be investigative? That, I think, goes – if you're talking about new causes of action based on new facts. Of course. Every cause of action has a different factual background. You can have two causes of action based on the same facts, which is what we have in this case. We have the original cause of action that Mr. Butler is prosecuted for in 1991, which is that he shot Officer Hartless. And then in 1993, these six gentlemen are prosecuted for conspiracy in connection with it. Those are really the same facts. Because we're not saying that Butler didn't shoot Officer Hartless. We're just saying these guys are all liable for the conspiracy. So if you're talking about brand new facts that implicate brand new people, I think we're into the whodunit side of it and we need a different analysis. But if we're just talking about how to present the case, then we ought to be in prosecutorial immunity realm. Okay. It's frustrating for me, you know, in the context of arguing this in the context of a summary judgment because, you know, the evidence just isn't there. I've got a client who considers himself a respectable attorney and he's being accused of everything in the world, bribing witnesses, providing a brothel for them to have sex in. He takes exception to that. And he would like to have some evidence against him, please, before he... Or maybe he wants his name in court. Well, he shouldn't have to have his name in court if there's no evidence to bring him before a jury. Any party has the right. You know, you can't just make stuff up and throw it at people. If we did that to Mr. Butler or to Mr. Argyle's client, I'm sure he would take exception to the fact that we just made stuff up and threw it at him. I'm sure he wouldn't like that. Well, we don't like it either. And there should be at least some evidence to support getting a case before a jury and getting it to trial. And the time to do that was at the summary judgment. You can make an argument that in many cases where there's immunity, you shouldn't hold people to too strict a standard because they haven't had an opportunity to do depositions. Are we to treat this as a summary judgment or a motion to dismiss? It's summary judgment. Everybody agrees on that? Yes. You agree with that? As long as the court can rule and take into account that Kennedy's findings, yes, absolutely. And if he wants evidence, we'll be glad to provide him his case. Well, it should have been then and not now. We're on the field now. It's just a frustrating thing because if the normal rules apply. In this case, there's no real logical justification for holding him to a lesser standard because unlike in a police case, you don't have a developed record. You don't know except what the policeman puts in his report what he said he did. In this case, Darren Palmer went through weeks of cross-examination in both trials. And then there was a habeas that went on for months. Everybody agrees to that. So this case was limited to death in a courtroom before we ever got here. If they don't have the facts now, when are they going to get them? If the evidence isn't there now, where is it? I think Mr. Wood might want to say something unless you have any questions for me.  Thank you, Your Honor. I only have one comment, and that's with respect to Judge Kennedy's report. I have no objection to the court addressing the admissibility or not admissibility of that. I need not remind the court that my client was not a party to that hearing. He wasn't representative at the hearing. So I'd be surprised to not be considered. Well, wait a minute. I didn't hear you. This court should not consider Judge Kennedy's ruling. My client was not a party to that hearing. He didn't play a part in that hearing. He wasn't represented. And I believe the law is well settled in the circuit that you can't take the findings of fact from one hearing and admit it in another hearing for the truth of the matter. And I submit that that's exactly what the appellees want to do with Judge Kennedy's report in this case. And I submit that it should not be considered for any purpose by this court. Thank you. All right. Anything else? We submitted Judge Kennedy's report because he made that report after hearing three months' testimony. Now, I suppose in lieu of that, we could have submitted 17 feet of transcripts to the district court and said, here, go fish it out, or here's the basis of it, and we can do that. But it seems to me, for the purpose, at least, of addressing the issue, I think we should do that. You could do that. You could submit 17 feet of transcripts to the district court and say, fish it out. It seems to me that, well, in reference to the pages in it, even, it's a massive record. Judge Kennedy was affirmed on appeal, and it seems to me that it's fair to ask the court, at least for purposes of determining whether there's a sufficient factual assurance. Well, you filed an assembly judgment motion, right? Did you file it? No. Oh, they filed it. They filed it. They filed it. Now, did you file? What other documents were filed in connection with it? As best as I can recall, Judge Fredersen, they filed a motion for summary judgment on the grounds of absolute immunity. The only factual material they submitted to the court was a one-page declaration from Mr. Burt and a one-page declaration from Mr. Cisneros, basically saying in highly conclusive terms, we didn't do anything wrong. We submitted to the court that we had alleged specifically in the complaint certain things, and as factual support for the basis for our claims, we submitted to the court Judge Kennedy, who was the referee, he was the former U.S. attorney in our district, then he became a Superior Court judge, and he was the judge at the first and second trial, and he heard the habeas proceeding. So he made specific findings of fact after a contested judicial proceeding at which all parties had a thorough opportunity to be heard, including the county of San Diego. Then it was appealed to the Fourth District Court of Appeals, state court. It adopted those findings and affirmed Judge Kennedy factually, although they demanded the matter for a third trial. We believe that under Rule 201 of the Federal Rules of Evidence, they're absolutely appropriate to submit, especially since there's nothing really other than a conclusory statement saying by Cisneros, I only did what Burt told me and I acted as an investigator and that's it. And Burt said, I really just prosecuted the case and I'm not aware of the identity of Samaritan, and that's it. And Judge Kennedy, who heard Mr. Burt's testimony for four days, and who was present at the case when Cisneros, who was represented by counsel, he took the Fifth Amendment in the habeas proceeding, was present, but there was a plenary evidentiary hearing, plenary evidentiary hearing, and in fact, much of the complaint, I have to confess, was plagiarized, either from Judge Kennedy's findings of fact or from the Court of Appeals' decision. It was not a hard complaint to draft, so if the court feels that it can't take summary judgment, I mean can't take judicial notice or that there's any real issue, we'd ask the court for a remand so that we can present what I consider to be a super abundance of evidence. But I think, and I would submit that there is no reason why this court can't look at the reasoned determinations and decisions of an earlier court for the purpose of determining whether there's a factual basis to permit the case to go forward. Well, thank you for bringing all this business to us. We really appreciate it. Thank you very much for hearing us. Thank you. Well, we'll leave that until 9 a.m. tomorrow morning. Thank you.
judges: Pregerson, Cowen , W. Fletcher